# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JOLY GERMINE,

Defendant.

Criminal Action No. 22-161 (JDB)

## MEMORANDUM OPINION

Defendant Joly Germine is charged by superseding indictment with one count of conspiracy to commit hostage taking (18 U.S.C. § 1203(a)) and 16 counts of hostage taking and aiding and abetting (18 U.S.C. §§ 1203(a), 2). See Superseding Indict. [ECF No. 10] ("Indict.") at 1–9. Trial is scheduled to begin on May 5, 2025.

Currently before the Court are three motions from the defendant and one from the government. Germine moves to dismiss the case; suppress statements that he made to the FBI; and prevent the government from impeaching him with, or mentioning during its opening statement, his prior convictions. See Mot. Dismiss [ECF No. 51]; Mot. Suppress [ECF No. 40]; Mot. Limine Exclude Def.'s Prior Conv. [ECF No. 43] ("Mot. in Limine"). The government moves to introduce evidence under Federal Rule of Evidence 404(b). See Mot. 404(b) Evid. [ECF No. 39] ("Mot. 404(b)").

The parties oppose one another's motions. See Def.'s Mem. Opp. Gov't's Mot. 404(b) Evid. [ECF No. 52] ("Opp'n 404(b)"); Gov't's Opp'n Def.'s Mot. Dismiss [ECF No. 53] ("Opp'n MTD"); Gov't's Omnibus Opp'n Def.'s Mots. [ECF No. 54] ("Omnibus Opp'n"). And both parties filed replies. See Def.'s Reply Opp'n Mot. Dismiss [ECF No. 55] ("Reply MTD"); Def.'s Reply Supp. Mot. Suppress [ECF No. 56] ("Reply Mot. Suppress"); Reply Supp. Mot. 404(b)

1

[ECF No. 57] ("Reply 404(b)").  The motions are now fully briefed and ripe for resolution.

## Background

400 Mawozo is a Haitian gang and criminal organization that operated in and around the Croix-des-Bouquets area near Port-au-Prince, Haiti.  Indict. ¶ 1.[1]  Joly Germine, a Haitian citizen, is the founder and a leader of 400 Mawozo.  Id. ¶ 2.  The gang generated revenue through criminal activity, including car theft, extortion, and kidnapping for ransom.  Id. ¶ 3.  In or around January 2020, 400 Mawozo began committing armed kidnappings of U.S. citizens in Haiti specifically.  Id. ¶ 4.  And when it did so, it often did so at the direction of Germine, who approved hostage takings and releases, "confer[red] with other 400 Mawozo leaders [to] agree on the terms of ransom payments" in hostage situations, and "direct[ed] payments," including from ransoms, "to be made to gang members."  Id. ¶¶ 8–9.  The gang's illicit activities perpetuated a cycle of criminality: the gang secured money from theft, extortion, and kidnapping ransom payments; used the money to pay its members and purchase weapons and ammunition; and used those weapons and ammunition to commit additional crimes.  See id. ¶¶ 3–4; Mot. 404(b) at 2–3.

In late 2021, Germine was in Haitian prison and wanted out.  With Germine directing gang finances and activities via "unmonitored cellular phones" that he used to maintain "regular contact with other 400 Mawozo leaders," Indict. ¶ 7, he instructed the gang to kidnap 17 Christian missionaries, including 16 U.S. citizens, for the purpose of "compel[ling] a third person to pay ransom for the[ir] release . . . and to secure" Germine's release from prison.  Id. ¶¶ 16, 17(b), 19.  The kidnapping, which lasted from approximately October 16 to December 16, 2021, gave rise to the charges in this case.

---

[1] This summary is based on the factual assertions in the indictment and the government's motions, which the Court relates solely as a summary of what the government intends to prove at trial.  The Court's reliance on these alleged facts for purposes of this opinion should not be construed as an endorsement of their truth, which is a determination for the jury.

According to the government, Germine was intimately involved with the charged hostage taking from start to finish.  Id. ¶¶ 5, 16–17.  On October 16, a 400 Mawozo associate called Germine to report that the associate had identified the missionaries as targets for a hostage taking.  Id. ¶ 17(a).  Germine then "instructed 400 Mawozo members" to take the missionaries "captive," which the members did that same day.  Id. ¶ 17(b)–(h).  A different 400 Mawozo leader then called a representative of the hostages' organization and demanded a $1 million ransom per hostage.  Id. ¶ 17(i).  The same day, Germine held several additional phone calls with 400 Mawozo members and "instructed [the gang] . . . to take care of the Hostages, as they were key to [his] freedom."  Id. ¶ 17(j)–(m).

During the two-month hostage situation, 400 Mawozo members "made ransom demands or negotiated ransom with representatives" of the 16 U.S. hostages on at least 18 occasions.  Id. ¶ 17(dd); see also id. ¶¶ 17(s), (y).  The gang also made repeated threats about the necessity of the ransom payments, claiming they would kill or stop feeding the hostages absent payment.  See id. ¶¶ 17(o), (q).

The theme that the hostages were also a bargaining chip for Germine's release from prison was repeated throughout the two-month ordeal.  For example, the interpreter for the gang told the hostages "they would be alright because they were being held in exchange" for Germine's release, id. ¶ 17(n); a 400 Mawozo leader conveyed to the hostages' representative that 400 Mawozo wanted Germine's release "in lieu of ransom," id. ¶ 17(t); and in late-November, after authorizing the release of two hostages for medical reasons, Germine instructed the gang that "no additional hostages would be released unless [he] was released from prison," id. ¶ 17(x).  Germine later gave 400 Mawozo "permission" to release three additional hostages around December 5 after having received a ransom payment.  Id. ¶¶ 17(x), (aa)–(bb).  All hostages had either been released or had

escaped by December 16, 2021.  Id. ¶ 17(cc).

On May 3, 2022, the Government of Haiti sent Germine to the United States pursuant to his indictment in this District on charges of conspiracy to violate U.S. export controls, violations of the Export Control Reform Act, and smuggling charges stemming from his role in facilitating the purchase and shipment of firearms from the United States to 400 Mawozo.  See Mot. Dismiss at 2; see also Indictment, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 11];[2] Arrest Warrant, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 30].  Germine was indicted on the instant charges on May 10, 2022.  See Indict. [ECF No. 1] at 1.

## Analysis

## I.    Motion to Dismiss

Germine moves to dismiss the case for two reasons.  First, he argues that this prosecution violates the rule of specialty, which provides that an individual extradited pursuant to a treaty may only be prosecuted for the charges underpinning his extradition.  Mot. Dismiss at 3–5.  Alternatively, Germine contends that the United States committed "outrageous conduct" by "trick[ing]" the Haitian government into extraditing him such that his prosecution violates the Due Process Clause.  Id. at 5–7.  The government raises several points in response: Germine lacks standing to bring a rule of specialty claim; even if he had standing, Germine was not extradited pursuant to a treaty and the rule thus does not apply; and the United States' conduct did not violate his due process rights.  See generally Opp'n MTD at 3–9.

### A.  Rule of Specialty

"Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures."  United States v. Alvarez-

---

[2] Unless as indicated here, all ECF numbers correspond to the docket in the instant case, United States v. Germine, Crim. A. No. 22-161 (JDB).

<u>Machain</u>, 504 U.S. 655, 664 (1992).  "The Supreme Court has recognized that a defendant who has been brought to the United States through a formal extradition treaty can, in some circumstances, challenge either the indictment or prosecution as violative of the relevant extradition treaty."  <u>United States v. Trabelsi</u>, Crim. A. No. 06-89 (RWR), 2015 WL 13227797, at *2 (D.D.C. Nov. 4, 2015) (collecting Supreme Court cases).

The rule of specialty, a principle of international law, provides that "once extradited, a person can be prosecuted only for those charges on which he was extradited."  <u>United States v. Lopesierra-Gutierrez</u>, 708 F.3d 193, 206 (D.C. Cir. 2013) (quoting <u>United State v. Sensi</u>, 879 F.2d 888, 892 (D.C. Cir. 1989)); <u>United States v. Rauscher</u>, 119 U.S. 407, 424 (1886).  But "[u]nless a treaty . . . specifically binds the U.S. government, courts cannot impose international law barriers to U.S. prosecutions."  <u>United States v. Trabelsi</u>, 28 F.4th 1291, 1306 (D.C. Cir. 2022) (Rao, J., concurring).  The extradition treaty between the United States and Haiti, like many treaties, codified the rule of specialty, providing that "[a] person surrendered cannot, without consent of the State which has granted the extradition, be detained or tried in the State which has obtained his extradition, for any other crime or causes than those which have given rise to the extradition."  Treaty for the mutual extradition of criminals, United States–Republic of Haiti, art. VIII, June 28, 1905, 34 Stat. 2858 [ECF No. 51-5] ("Treaty").

Germine argues that the rule of specialty applies here because he was extradited from Haiti under the bilateral treaty and only on charges related to the firearm smuggling scheme.  His prosecution for hostage taking is therefore an impermissible prosecution for a "crime . . . [other] than those which . . . [gave] rise to [his] extradition."  Treaty, art. VIII; <u>see</u> Mot. Dismiss at 4–5. Although it is an open question in this Circuit whether a criminal defendant, rather than the

extraditing state, may even bring a claim for a violation of the rule of specialty,[3] the claim readily fails on the merits.

Germine must prove several steps to prevail on the rule of specialty argument, but he promptly fails at the first: Germine was not extradited pursuant to the treaty. The treaty provides that the parties will mutually surrender persons charged with enumerated crimes. Treaty, art. I. Article II then lists 12 "crimes for which extradition shall be granted." Id. art. II; see id. art. III (treaty also applies to attempts of the enumerated crimes). The treaty does not contain an article mandating or authorizing discretionary extradition for other crimes.

In its letter to the Haitian Ministry of Justice requesting Germine's transfer in April 2022, the United States represented that Germine was "wanted on charges of Conspiracy to Violate the Export Control Reform Act, and to Defraud the United States; Export Control Reform Act; and Smuggling, Aiding and Abetting, Causing an Act to be Done." Letter from Charge d'Affairs, a.i., Nicole D. Theriot to Minister of Justice Berto Dorcé (Apr. 22, 2022) [ECF No. 51-3] ("Theriot Letter") at 2. None of those crimes are among the 12 provided for in the treaty. Germine does not acknowledge, let alone attempt to explain, this first shortcoming in his argument.[4] And even if Article II of the Treaty provided for extradition for export control violations or smuggling, just because a defendant's extradition could fall within the scope of an extradition treaty does not mean the states necessarily invoked the treaty for his transfer.

---

[3] Germine argues that he has standing but points only to cases outside of our Circuit. See Mot. Dismiss at 5. The Court follows the D.C. Circuit in declining to resolve this question where, as here, Germine's claim fails on the merits. See, e.g., Lopesierra-Gutierrez, 708 F.3d at 206 (acknowledging the open question and taking same approach); Sensi, 879 F.2d at 892 & n.1 (same).

[4] Cf. United States v. Campbell, 300 F.3d 202, 209 (2d Cir. 2002) ("[T]he question of whether an extradition treaty allows prosecution for a particular crime that is specified in the extradition request is a matter for the extraditing country to determine.").

Germine next argues that the plain text of the Theriot Letter points to his treaty-based extradition, emphasizing that the United States "request[ed] the assistance of the [Haitian] Ministry of Justice in <u>extraditing</u>" Germine.  <u>Id.</u> at 2 (emphasis added).  But the mere use of the word "extradite" does not mean the parties did extradite Germine pursuant to the treaty.  "Extradite" broadly means "[t]o surrender or deliver (a fugitive) to another jurisdiction."  <u>Extradite</u>, Black's Law Dictionary (12th ed. 2024).  And in the Theriot Letter, the United States requested that Haiti "extradite" Germine in that broader sense, "through deportation, expulsion, or any other lawful means."  Theriot Letter at 2.

This is consistent with our Circuit's case law recognizing that "extradition [is] a 'sovereign act,' and treaties are not required in order to seek an extradition." <u>United States v. Trabelsi</u>, 845 F.3d 1181, 1186 (D.C. Cir. 2017) (quoting M. Cherif Bassiouni, International Extradition: United States Law & Practice 25 (5th ed. 2007)).  It follows that just because an extradition treaty exists does not mean all "extraditions" between those two countries must utilize an available treaty.  <u>See, e.g.</u>, <u>Alvarez-Machain</u>, 504 U.S. at 668–69 ("[T]o infer from this Treaty and its terms that it prohibits all means of gaining the presence of an individual outside of its terms goes beyond established precedent and practice."); <u>United States v. Gardiner</u>, 279 F. App'x 848, 850 (11th Cir. 2008) (per curiam) (recognizing that even where the parties have initiated a formal extradition, the government "may obtain custody of a defendant by other methods, including abduction, expulsion, or surrender by the host country").  As the government points out, "the Haitian government could have responded to the U.S. request for custody by requiring the United States to follow the terms of the extradition treaty," but "[i]t did not."  Opp'n MTD at 8.

Finally, the facts of Germine's transfer to the United States further support that he was not extradited pursuant to the treaty.  The government represents that aside from the Theriot Letter,

the United States, including the Department of Justice, "did not make any other formal extradition request." Id. at 2. Although the Theriot Letter could be interpreted as a "demand for extradition . . . made through the diplomatic agents of the High Contracting Parties," Treaty, art. X, that the only written communication from the United States did not mention the treaty—and, in fact, expressly acknowledged other vehicles for Germine's transfer—lends credence to the notion that the parties did not utilize the treaty for his transfer. See Theriot Letter at 2 (requesting Germine "through deportation, expulsion, or any other lawful means"). Additionally, the government did not pursue an extradition warrant for Germine, and there is no evidence that the Haitian government held a hearing or other judicial inquiry to analyze the extradition for consistency with the treaty, as is commonplace in treaty-based extraditions. See Mot. Dismiss at 2 n.2; Opp'n MTD at 2, 4–5; Treaty art. XI (contemplating pre-extradition judicial review in the extraditing state); see, e.g., Johnson v. Browne, 205 U.S. 309, 311–12 (1907) (explaining Canadian courts' pre-extradition review pursuant to the treaty); Trabelsi, 845 F.3d at 1189 (same with Belgian courts); Casey v. Dep't of State, 980 F.2d 1472, 1474–75 (D.C. Cir. 1992) (same with Costa Rican courts).

Finally, the conclusion that Germine was not extradited under the protections of the treaty is also consistent with "the government's understanding that [Germine] was expelled/deported from Haiti by its government." Opp'n MTD at 2. It would be somewhat remarkable for this Court to conclude that although the plain text of the treaty does not cover extradition for export control and smuggling violations; the treaty does not require its use in all bilateral extraditions; the United States never mentioned let alone formally invoked the treaty; Germine has provided no evidence that the Government of Haiti reviewed the extradition request for consistency with the treaty; and the United States emphatically contends that it did not use the treaty—Germine was still transferred to U.S. custody under the treaty. The Court instead adopts the more logical conclusion

that Germine was transferred through "deportation, expulsion, or any other lawful means," as the United States had requested.  Theriot Letter at 2.

Because Germine was not extradited pursuant to the treaty, the rule of specialty is not a barrier to his prosecution.

### B.  Due Process Clause

Germine argues next that the FBI's conduct in bringing him to the United States was "so outrageous" that due process prohibits his prosecution.  See Mot. Dismiss at 6.  The Supreme Court has acknowledged that there may exist "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  United States v. Russell, 411 U.S. 423, 431–32 (1973). Germine makes no colorable argument that this standard is satisfied here.

Germine does not allege any facts at all.  He simply states that his "surrender was clearly accomplished by trickery to both him and the Haitian government."  Mot. Dismiss at 6.  But see Opp'n MTD at 7 (noting the government is not aware of any complaints from the Haitian government about the extradition).  Without alleging facts that constituted the alleged trickery, Germine's contention is simply an insufficient and conclusory assertion.  See, e.g., United States v. Williamson, Crim. A. No. 14-151 (RMC), 2014 WL 12695537, at *5 (D.D.C. Oct. 20, 2014) (defendant's assertion of outrageous conduct was insufficient where he asserted "only that he believes he has been stalked for fifteen years by government agents").  Moreover, even if Germine had provided some facts allegedly showing trickery, "the mere fact of deceit [does not] defeat a prosecution."  Russell, 411 U.S. at 435–36.  Deceit and trickery fall far short of the "coercion, violence or brutality" required for a court to find outrageous conduct.  See Williamson, 2014 WL 12695537, at *5 (quoting United States v. Kelly, 707 F.2d 1460, 1476 (D.C. Cir. 1983)).

Germine also argues that the government acted outrageously in failing to use "diplomatic channels to seek [Germine's] presence in the United States," which is "paramount to an abduction." Mot. Dismiss at 6. But even if the United States had abducted Germine, that, too, is insufficient to bar his prosecution. See Alvarez-Machain, 504 U.S. at 669 (upholding prosecution where government secured defendant by abduction, even though an extradition treaty existed and Mexico had protested the abduction); Ker v. Illinois, 119 U.S. 436, 444 (1886) (denying due process argument and concluding defendant's "forcible abduction" from Peru by a private messenger "presents no valid objection to his trial"); Frisbie v. Collins, 342 U.S. 519, 520–22 (1952) (denying due process argument and upholding prosecution where defendant was kidnapped from Illinois by Michigan officers and tried in Michigan).

For the foregoing reasons, the Court will deny Germine's motion to dismiss on both bases.

## II.  **Motion to Suppress**

Germine next moves to suppress the statements that he made to the FBI on May 3, 2022, during his flight from Haiti to the United States. This half-hearted motion is, as Germine acknowledges, "essentially the same" as the motion that he filed in his prior case and which the Court denied.[5] As such, issue preclusion bars Germine from bringing this motion a second time.

Issue preclusion bars "the relitigation of specific issues actually adjudicated in prior proceedings," Lans v. Adduci Mastriani & Schaumberg L.L.P., 786 F. Supp. 2d 240, 302 (D.D.C. 2011), "even if the issue recurs in the context of a different claim," Taylor v. Sturgell, 553 U.S. 880, 892 (2008). Preclusion helps "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and [ ] prevent serial forum-

---

[5] Compare Mot. Suppress at 1 n.1 with Mot. Suppress, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 81]; see Mem. Op. & Order, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 108] at 3–5 (denying the motion).

shopping and piecemeal litigation." See Hardison v. Alexander, 655 F.2d 1281, 1288 (D.C. Cir. 1981).

For issue preclusion to apply, (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case," (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case," and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992).

On the first two factors, "[i]t is abundantly clear that the issue of" Germine's motion to suppress his May 3, 2022 statements "was presented and contested by the parties in" the previous case. See Acosta v. District of Columbia, Civ. A. No. 20-1189 (RC), 2021 WL 965580, at *4 (D.D.C. Mar. 15, 2021). Germine acknowledges that the instant motion is nearly identical to the motion that he filed in the prior case, and in that case the Court "considered the parties' respective motions," held an evidentiary hearing, and ultimately "rejected [Germine's] argument that the" statements should be suppressed, memorializing its decision in a written opinion. See Martin v. Dep't of Just., 488 F.3d 446, 454 (D.C. Cir. 2007); Mem. Op. & Order, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 108] at 3–5.[6] Furthermore, the Court issued a final judgment in that case. See Judgment as to Joly Germine, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 228]. Although Germine has appealed his convictions, see Reply Mot. Suppress at 1, it is "well-settled federal law[ that] the pendency of an appeal does not diminish the res judicata effect of a judgment rendered by a federal court." See Hunt v. Liberty Lobby, Inc., 707

---

[6] To the extent that Germine's motion raises any new arguments, "issue preclusion works to bar re-litigation of the entire issue decided, 'not just the particular arguments raised in support of it in the first case.'" Lans, 786 F. Supp. 2d at 303 (quoting Yamaha Corp., 961 F.2d at 254).

F.2d 1493, 1497–98 (D.C. Cir. 1983); see also, e.g., Restatement (Second) of Judgments § 13 (1982) ("[F]or purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.").

Third and finally, the Court does not discern any unfairness from applying issue preclusion here. Germine's "incentives to litigate the" motion to suppress "were no less present in the prior case"—where he faced a 48-count second superseding indictment and a significant prison sentence—than here, where he again faces a multi-count indictment and a significant prison sentence. See Martin, 488 F.3d at 455; compare Indict. with Second Superseding Indict., United States v. Germine, 21-699 (JDB) [ECF No. 73].

Because Germine can have only "one bite at the [suppression] apple," and he took that bite in the prior case, issue preclusion bars his motion to suppress. See Capitol Servs. Mgmt. v. Vesta Corp., 933 F.3d 784, 794 (D.C. Cir. 2019).[7]

## III.    **Motion to Admit Evidence**

Turning next to the government's motion, the government seeks to introduce evidence of Germine's prior acts that falls into three groups: Germine's involvement in (1) 400 Mawozo's kidnapping of U.S. citizens prior to the charged conspiracy, (2) 400 Mawozo's money laundering and gun smuggling between the United States and Haiti prior to and during the charged conspiracy, and (3) 400 Mawozo's release of C.G., a hostage victim, after the charged conspiracy. See generally Mot. 404(b). The government contends that this evidence is admissible either as intrinsic

---

[7] If issue preclusion did not apply, the Court would deny Germine's motion for the same reason it did in the prior case: "no factor . . . supports the view that Germine's statements were involuntary, considering the totality of the circumstances surrounding his custodial interview," and, conversely, "the government has established the voluntariness of Germine's statements." See Mem. Op. & Order, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 108] at 3–5.

to the charged offenses or as extrinsic evidence of other crimes, wrongs, or acts admissible for a non-propensity purpose under Federal Rule of Evidence 404(b)(2).  See id. at 1–2.

Intrinsic acts are those that are either "part of the charged offense" or uncharged but were "performed contemporaneously with the charged crime . . . [and] facilitate[d] the commission of the charged crime."  See United States v. McGill, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam) (alterations in original) (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)).  A court need not perform a Rule 404(b) analysis for admissibility; intrinsic evidence is admissible as long as another Federal Rule of Evidence (namely Rule 403) does not bar it.

The admissibility of extrinsic evidence—or "[o]ther [c]rimes, [w]rongs, or [a]cts" that are not part of the charged offense—is governed by Rule 404(b).  Rule 404(b) is a rule of "inclusion rather than exclusion," prohibiting the admission of other acts evidence in only one circumstance: "for the purpose of proving that a person's actions conformed to his character."  Bowie, 232 F.3d at 929–30 (internal quotation marks omitted).  In other words, a court may "admit other-acts evidence so long as the evidence is offered for any other relevant purpose, including 'proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'"  United States v. Moore, 75 F. Supp. 3d 444, 450–51 (D.D.C. 2014) (cleaned up) (quoting Fed. R. Evid. 404(b)(2)).

For each piece of evidence the government seeks to admit, the Court analyzes whether it is intrinsic or extrinsic; if extrinsic, performs the Rule 404(b) analysis; and finally determines whether Rule 403, which balances the probative value of evidence against its potential for unfair prejudice, bars admission.

### A.  400 Mawozo's Summer 2021 Kidnappings

13

Beginning broadly, the government proffers evidence of 400 Mawozo's structure and operations from as early as August 2020 through as late as May 2022, including evidence that Germine exercised control of 400 Mawozo and its hostage-taking operations during this period. See Mot. 404(b) at 5–6. More specifically, the government also seeks to introduce evidence that in June 2021, Germine agreed with another gang to commit kidnappings and split the profits; and between June and September 2021, 400 Mawozo committed three armed kidnappings of U.S. citizens, demanded ransom, and released the victims in two of the cases only after the gang received ransom payments. See id.

Recall that the first inquiry is whether the evidence is intrinsic, or whether these acts are "part of the charged offense[s]" or were "performed contemporaneously with the charged crime[s]" and facilitated their commission. See McGill, 815 F.3d at 879. The D.C. Circuit has underscored that intrinsic evidence is a "narrow" category. See Bowie, 232 F.3d at 929.

The evidence of 400 Mawozo's structure and operations includes evidence that Germine led 400 Mawozo from at least August 2020 through May 2022; that 400 Mawozo leaders Lanmo Sanjou and Gaspiyay worked for and took instructions from Germine from at least April 2021 through May 2022; and that as of June 2021, Germine directed Sanjou and Gaspiyay on 400 Mawozo's hostage-taking operations. Mot. 404(b) at 5–6. This evidence is intrinsic. All three pieces of structural evidence occurred during the period of the charged conspiracy from October to December 2021. And Germine's leadership of 400 Mawozo's hostage-taking operations during the charged conduct, including that he issued instructions on hostage taking, is direct evidence that he was part of a conspiracy to commit hostage taking and aided and abetted a hostage taking during that same timeframe. See also Indict. ¶ 17(b) (as an overt act, Germine instructed 400 Mawozo to take the missionaries hostage).

14

Although some of this conduct began prior to the charged conduct, evidence of acts that began prior to but continued during the charged conduct is admissible in whole because the conduct "continued after [Germine] entered into the charged conspiracy" and "became direct evidence of the [same conduct] within the conspiracy." McGill, 815 F.3d at 882. The same rationale applies to the evidence of Germine's leadership that occurred during the time of the charged conduct and continued for a few months afterwards.[8]

Turning to the incident-specific evidence, the government proffers evidence of three hostage takings committed by 400 Mawozo from June to September 2021 and evidence that during summer 2021 the hostage-taking ransoms were paid to Sanjou, who eventually provided them to Germine, who then directed the gang's bookkeeper on how to disburse them. See Mot. 404(b) at 5–6. The government doesn't really explain why this information is intrinsic; it simply claims that the evidence is and proceeds to a Rule 404(b) argument. Id. at 5–6. That pivot is smart, because the summer 2021-specific information is clearly extrinsic to the October to December 2021 conspiracy and hostage taking. "As a threshold matter, evidence relating to acts occurring prior to the start of an alleged conspiracy cannot be considered intrinsic evidence." United States v. Lorenzana-Cordon, 141 F. Supp. 3d 35, 41 (D.D.C. 2015); see, e.g., United States v. Lerma-Plata, 919 F. Supp. 2d 152, 160–61 (D.D.C. 2013) (similar); see also United States v. Thorne, Crim. A. No. 18-389 (BAH), 2020 WL 122985, at *13 (D.D.C. Jan. 10, 2020) (noting intrinsic evidence focuses on "temporal proximity").

This makes sense. Summer 2021 hostage takings were not performed contemporaneously with a fall 2021 hostage taking. So the summer 2021 acts are only intrinsic if they are part of or

---

[8] The Court would also find this evidence admissible under Rule 404(b)(2) as evidence of, inter alia, Germine's "intent to act in concert with" 400 Mawozo in hostage-taking operations. See United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000).

direct evidence of the fall 2021 hostage taking or conspiracy.  See United States v. Roberson, 581 F. Supp. 3d 65, 72 (D.D.C. 2022).  They are neither.  Hostage takings of different individuals that ended by early September (and are not mentioned anywhere in the indictment) are not part of or direct evidence of the conspiracy and hostage taking of different individuals beginning in mid-October.  See Indict. ¶¶ 16, 19.  In its reply, the government attempts to enlarge the charged conspiracy, claiming the summer and fall kidnappings "occurred in the same general time frame—June to December 2021," and the conspiracy was "larger than one act of kidnapping."  Reply 404(b) at 2.  But the government can't simply enlarge the conspiracy for the purpose of admitting additional evidence as intrinsic.  The government decided to charge the conspiracy from on or around October 16, 2021, to December 16, 2021, and that is the conspiracy used to assess whether evidence is intrinsic.  A broader interpretation of intrinsic evidence would be inconsistent with the "narrow" lines that this Circuit has drawn.  See Bowie, 232 F.3d at 929.

To be admissible, the summer 2021 kidnapping evidence must then come in under Rule 404(b) as "relevant to a material issue other than character," Roberson, 581 F. Supp. 3d at 70, such as proving motive, opportunity, intent, preparation, plan, or knowledge, Fed. R. Evid. 404(b)(2).  In conspiracy prosecutions, the government "is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" United States v. Mathis, 216 F.3d 18, 26 (D.C. Cir. 2000) (quoting United States v. Williams, 205 F.3d 23, 33–34 (2d Cir. 2000)).  Courts also permit evidence of "other acts" to show "the nature of a conspiracy and the kind of organizational control a defendant exercised" or "the defendants' intent to act in concert." McGill, 815 F.3d at 879 (internal quotation marks omitted).

16

The evidence of the summer 2021 kidnappings has several of these permissible purposes. To start, evidence that 400 Mawozo committed multiple, similar armed hostage takings of U.S. citizens for ransom just a few months prior to the charged conduct, and during a period where Germine controlled the gang's hostage-taking operations, tends to show "the nature of [the] conspiracy," including the intent to take hostages for ransom. McGill, 815 F.3d at 879; see, e.g., United States v. Straker, 800 F.3d 570, 588 (D.C. Cir. 2015) (affirming district court's admission of three prior uncharged hostage takings as probative of the charged hostage-taking conspiracy's formation and defendants' intent).

The similarities between the charged and uncharged hostage takings—the same perpetrators (400 Mawozo), type of victims (U.S. citizens), method (at gunpoint), and goal (obtaining ransom payments)—also "have significant probative value regarding [Germine's] intent, preparation, plan, knowledge, absence of mistake, and lack of accident—all of which are permissible, non-character purposes for the evidence." Moore, 75 F. Supp. 3d at 451 (cleaned up); see, e.g., United States v. Delgado, Crim. A. No. 22-304 (JEB), 2023 WL 8354928, at *6 (D.D.C. Dec. 1, 2023) (in hostage-taking case, admitting extrinsic evidence of past hostage takings that shared multiple "idiosyncratic similarities" to the charged conduct, including the defendant's method, use of an accomplice, and ransom demand). "Any questions about motive also tend[] to be put to rest by evidence that [Germine and his co-conspirators] successfully obtained ransoms in the other, uncharged hostage takings." Straker, 800 F.3d at 590–91.

Germine's prior deal with another gang to commit hostage takings and split the profits is also highly relevant to his knowledge and intent. Recall that Germine was incarcerated during the charged crimes. Evidence that he had made deals to commit other hostage takings for ransom while in prison tends to show that he had the intent to commit the charged hostage taking for

ransom and knowledge of 400 Mawozo's hostage takings notwithstanding his incarceration.  In other words, the prior hostage takings are "certainly relevant to the determination of whether" Germine "knew what he was" doing when he communicated with and assisted 400 Mawozo in the fall.  See United States v. Cassell 292 F.3d 788, 794–95 (D.C. Cir. 2002); Indict. ¶ 17 (charging multiple instances of Germine communicating with 400 Mawozo from October to December 2021).

With these numerous reasons to admit the prior hostage takings, Germine's halfhearted argument that "the only purpose for introducing . . . prior kidnappings is to show that Mr. Germine acted in conformity," Opp'n 404(b) at 3, is simply not persuasive.  Germine also contends that any involvement in or control of 400 Mawozo by Germine in the summer 2021 kidnappings "does not equate with him still having such authority" during the charged conspiracy.  Id.  Even if this is true, it does not make the evidence less relevant or admissible.  Instead, it goes to what weight the factfinder should afford the evidence at trial.

Finally, for both the intrinsic structural evidence about 400 Mawozo and the extrinsic summer 2021 kidnapping evidence, a court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Rule 403 does not favor exclusion here. Evidence of the prior hostage takings, including Germine's plan to split the profits, is highly probative of his motive and intent.  See, e.g., United States v. Straker, 567 F. Supp. 2d 174, 178 (D.D.C. 2008); Moore, 75 F. Supp. 3d at 451.  And the Court discerns no danger of unfair prejudice.  Germine is charged with 16 counts of hostage taking, including of five children. Considering the evidence the government will likely introduce about the charged conduct during

its case-in-chief, evidence of three additional hostage takings of four individuals carries only a "minimal" risk of unfair prejudice.  See, e.g., Delgado, 2023 WL 8354928, at *6 (concluding the same in admitting evidence of past hostage taking).

Germine argues that "a jury would not be able to help but conclude that because [he] was involved in prior kidnappings then he must have been involved in the charged kidnappings." Opp'n 404(b) at 3.  But courts recognize that because all prior acts carry an inherent risk that the jury will use the evidence improperly for character purposes, exclusion under Rule 403 requires more than this general risk.  See, e.g., Moore, 75 F. Supp. 3d at 452.  And judges in this District have admitted evidence of prior hostage takings under Rule 404(b), concluding that it does not pose an inappropriate risk of prejudice.  See Straker, 800 F.3d at 592; Delgado, 2023 WL 8354928, at *6.

For these reasons, the Court will grant the government's motion to admit the evidence related to 400 Mawozo's structure, organization, and summer 2021 hostage takings.

### B.  Money Laundering and Gun Smuggling

The next set of evidence pertains to Germine's role in 400 Mawozo's money laundering and gun smuggling scheme.  In broad strokes, the government contends that Germine and 400 Mawozo had a conspiracy to commit hostage taking, which "provided the gang with proceeds that they transferred to the United States in order to purchase weapons," which the gang then used to take more hostages, perpetuating a cycle of criminality.  Mot. 404(b) at 14.  The government's evidence shows "Germine was a primary facilitator in th[is] scheme," including that he "was active in choosing the weapons to be purchased," "supervised money transfers to purchase the weapons," and controlled his U.S.-based co-conspirators "with respect to the money transfers."  Id. at 6–8.

And more specifically, Germine oversaw the purchase of at least 24 semi-automatic firearms in Florida between March and November 2021 for shipment to 400 Mawozo. Id. at 6–7.

None of this information is intrinsic. The purchases of firearms for 400 Mawozo, regardless of when they occurred, are neither charged offenses nor direct evidence of the October hostage taking or conspiracy. The government argues that this evidence is intrinsic because the indictment charges 400 Mawozo with armed hostage taking, and hence evidence of how 400 Mawozo acquired firearms is direct evidence of the weapons they may have used in that crime. See Reply 404(b) at 4. For this argument, the government relies on United States v. Payne, 805 F.2d 1062 (D.C. Cir. 1986). In Payne, the district court admitted two loaded firearms found near illegal drugs as evidence of the defendant's intent to distribute the drugs. Id. at 1064. The D.C. Circuit affirmed, emphasizing that courts have "uniformly . . . recognized that substantial dealers in narcotics possess firearms and that such weapons are as much tools of the trade" as other drug paraphernalia. Id. at 1065–66. But Payne only hurts the government's quest to deem this evidence intrinsic. Even though the court considered firearms "tools of the trade" with which the defendant was charged, it nonetheless considered the firearms extrinsic evidence: "because the guns were directly relevant to the issue of . . . intent . . . , they were admissible under Rule 404(b)." Id. at 1066.

The government's other theory is that the evidence is intrinsic because it "reveals the interlocking totality of the conspiracy" of which the charged hostage taking was "just one link" in a scheme that also included "purchasing guns with the ransom money, and using the guns to commit more hostage takings." Mot. 404(b) at 3, 12, 14–15. The government asserts that this Court's recent decision in United States v. Okafor, Crim. A. No. 23-116 (JDB), 2024 WL 4263928 (D.D.C. Sept. 23, 2024), is applicable here. See id. at 15. But in Okafor, cash seized from members

of the conspiracy was intrinsic evidence because the possession of cash was "part of the conspiracy, which had a primary 'goal' . . . of accumulation of profit." <u>Okafor</u>, 2024 WL 4263928, at *7. The indictment here narrowly charges that Germine conspired to commit the October 16 hostage taking "to compel a third person to pay ransom . . . and to secure" Germine's release from prison, nowhere charging that the purchase of firearms was an additional goal. Indict. ¶ 16. Once again, the government can't change the scope of the conspiracy for the sake of making more evidence intrinsic.

To be sure, several of the charged overt acts involved the use of firearms. <u>See</u> Indict. ¶¶ 17(c), (f), (h), (r), (w). But evidence that "may have some relevance to showing a conspiracy," such as how 400 Mawozo generally acquired firearms, is not sufficient to render that evidence intrinsic. <u>See</u> <u>McGill</u>, 815 F.3d at 883. As the D.C. Circuit has cautioned, "it cannot be that all evidence tending to prove the crime is part of the crime." <u>Id.</u> at 883. Such a low bar for intrinsic evidence would eviscerate the "narrow" lines that our Circuit has drawn and render Rule 404(b) "a nullity." <u>Bowie</u>, 232 F.3d at 929. The firearm purchases and related evidence are instead better viewed as extrinsic evidence that "complete[s] the story" of the conspiracy. <u>See</u> <u>Roberson</u>, 581 F. Supp. 3d at 71; <u>United States v. Khanu</u>, 664 F. Supp. 2d 80, 83 (D.D.C. 2009) (where an act "occur[red] prior to the commencement of the conspiracy period, that evidence is better analyzed as falling under the purview of Rule 404(b)").

The government argues that this evidence is alternatively admissible under Rule 404(b)(2) as evidence of Germine's motive, intent, preparation, and planning for the charged hostage taking. Mot. 404(b) at 11–12. The Court agrees. That Germine "was active in choosing the weapons to be purchased" for 400 Mawozo, "supervised money transfers to purchase the weapons," and "had control over [co-conspirators] with respect to the money transfers," <u>id.</u> at 7–8, will help "explain

to the jury how the illegal relationship between the participants in the crime developed," such as how Germine was involved with and instructed other 400 Mawozo members during his incarceration.  See Mathis, 216 F.3d at 26 (quoting Williams, 205 F.3d at 33–34).  This evidence further shows that Germine and 400 Mawozo "jointly engaged in other criminal activity," which "can be relevant to shed light on how the relationship of mutual trust developed between" alleged co-conspirators.  Straker, 800 F.3d at 590 (internal quotation marks omitted).

The firearm purchases also elucidate Germine's knowledge of and intent to aid and abet 400 Mawozo's criminality during his incarceration.  Evidence demonstrating knowledge and intent is "particularly probative where the government has alleged conspiracy," id. (quoting Mathis, 216 F.3d at 26), because "[p]otential juror doubt about whether [Germine] . . . was somehow mistakenly swept up into activities he did not know were part of a criminal conspiracy is powerfully undermined by the evidence of similar criminal teamwork with some of the same people."  Id.  Although hostage taking and gun smuggling are not similar crimes, the criminal networks were similar: prior to the charged conspiracy between Germine and 400 Mawozo members to commit hostage takings for ransom, Germine conspired with 400 Mawozo members to use ransom payments to purchase firearms and transfer them to the gang.

Germine's primary argument once again is that his control over 400 Mawozo's finances and firearms does not show control over the gang's hostage-taking operations several months later.  See Opp'n 404(b) at 5–6.  This argument again misses the mark, because those concerns go to the weight the jury should afford the evidence.  The inquiry here is simply whether the evidence is admissible for a permissible purpose, and it is—several times over.

Finally, Rule 403 does not bar admission.  Again, evidence that, as here, tends to show "intent" and "motive" "is particularly probative where the government has alleged conspiracy."

Mathis, 216 F.3d at 26 (quoting United States v. Sampol, 636 F.2d 621, 659 & n.23 (D.C. Cir. 1980)).  On the flip side, the Court detects no unfair prejudice.  Germine does not explain why the evidence would cause unfair prejudice.  Opp'n 404(b) at 6.  The only risk therefore seems to be "that a jury will use this evidence improperly" for character purposes, but that risk "exists in all 404(b) cases."  Moore, 75 F. Supp. 3d at 452.  This generic risk of prejudice is not "compelling or unique," id., and does not outweigh the evidence's high probative value.

Germine also claims that the evidence would require "'mini-trials' that will add significant time to the trial."  Opp'n 404(b) at 6.  The Court disagrees.  A juror need not determine whether Germine violated U.S. export control laws to understand that the evidence tends to show his long-term collaboration with and control over 400 Mawozo, including his involvement in selecting and purchasing weapons for the gang using ransom payments.  For all these reasons, then, the Court will grant the government's motion to admit the evidence related to the money laundering and gun smuggling, including the 24 firearm purchases.

### C.  Release of C.G.

Third and finally, the government seeks to introduce evidence of May 3, 2022, phone calls between Germine and Gaspiyay, a member of 400 Mawozo, that precipitated the release of 400 Mawozo hostage C.G.  See Mot. 404(b) at 8.  The government once again does not really argue that this evidence is intrinsic, see id. at 11, and the Court readily concludes that it is not.  Germine's role in securing the release of a separate hostage five months after the charged conduct ended (and after all individuals who Germine was charged with taking hostage had escaped or been freed) is not part of or even direct evidence of the charged hostage taking.  See, e.g., Khanu, 664 F. Supp. 2d at 84 (If an act is "never alleged in the indictment to be part of the conspiracy," then "evidence

[of that act] cannot be intrinsic" to the conspiracy.).  Nor did the May 2022 phone calls happen contemporaneously with the October to December 2021 conspiracy.

The government contends the phone calls are admissible under Rule 404(b)(2) because they are probative of Germine's "command and control over the gang's hostage takings."  Mot. 404(b) at 8–9, 11.  Recall that to meet 404(b)'s rule of admission, the evidence need only have "any tendency to make the existence of any [material] fact . . . more probable . . . than it would be without the evidence."  Bowie, 232 F.3d at 930 (quoting Fed. R. Evid. 401)).  That Germine had phone calls with 400 Mawozo members to coordinate the release of hostage C.G. and the gang released the hostage within 24 hours tends to make it more probable that Germine also had knowledge of and exercised control over 400 Mawozo's hostages a few months earlier.  See, e.g., United States v. Vazquez, Crim. A. No. 21-597 (BAH), 2023 WL 4488910, at *5–6 (D.D.C. July 12, 2023) (post-conspiracy conduct similar to the charged conduct demonstrated absence of mistake).

Germine once again does not meaningfully contest the Rule 404(b) analysis but raises a familiar argument that the evidence does not show his control of 400 Mawozo in May 2022, let alone during the charged conduct.  Opp'n 404(b) at 8.  Germine's concern goes to the weight of the evidence, not whether it is relevant and admissible.

For the third and final time, Rule 403, too, does not bar admission.  As before, evidence demonstrating knowledge or control in a conspiracy is highly probative.  See, e.g., Straker, 800 F.3d at 590–91.  And the phone call is not unfairly prejudicial.  As with the summer 2021 hostage takings, any prejudice from evidence about the release of one hostage is "minimal" in the context of the government's case-in-chief, which will undoubtedly include evidence about the armed hostage taking of 16 individuals, including several children.  See id. at 591; Indict. ¶ 19.  Germine

argues that this evidence has a "possibility of confusing the jury and wasting time," Opp'n 404(b) at 9, but fails to explain these concerns. The Court does not discern a potential for juror confusion or a waste of time.[9]

Finally, as relevant to all evidence admitted pursuant to Rule 404(b), Germine has in his back pocket the ability to request that the Court provide a limiting instruction to the jury "restrict[ing] the evidence to its proper scope," i.e., for non-propensity purposes. See Roberson, 581 F. Supp. 3d at 78. If Germine requests such an instruction, the Court "must immediately provide one." United States v. Hemphill, 514 F.3d 1350, 1357 (D.C. Cir. 2008) (quoting United States v. Brawner, 32 F.3d 602, 606 (D.C. Cir. 1994)). Germine argues that limiting instructions are insufficient, citing to three cases from the last approximately 90 years in which individual judges have expressed their skepticism. See Opp'n 404(b) at 9. But courts, particularly in this Circuit, routinely employ limiting instructions, and "[j]uries are presumed to follow" them. See Straker, 800 F.3d at 593.

## IV.   **Motion in Limine to Exclude Prior Convictions**

Germine's third and final motion requests that the Court prohibit the government from using his prior convictions either for impeachment or in its opening statement. See generally Mot. in Limine.[10] Should Germine testify at trial, the government intends to impeach his credibility

---

[9] Germine also argues that nearly all the government's proposed Rule 404(b) evidence should be excluded as "cumulative" under Rule 403. See Opp'n 404(b) at 4–7, 9. The Court concludes that Rule 403 does not bar admission of any of the evidence at this time, but Germine is free to renew this objection at trial when the Court will be in a better position to assess it in the context of the information already admitted into evidence. See, e.g., Lorenzana-Cordon, 141 F. Supp. 3d at 42 & n.3 (taking similar approach).

The Court also cautions the government that Germine is not on trial for the summer 2021 hostage takings, the hostage taking of C.G., or his prior convictions, and a certain amount of this evidence might rise to the level of unnecessarily cumulative or unfairly prejudicial under Rule 403. If it does, the Court is prepared to exclude it.

[10] Because Germine submitted the exact same motion in limine before his prior trial and thus before his eventual guilty plea, the instant motion only requests that the Court preclude the government from mentioning Germine's prior Haitian conviction, not the 48 counts to which Germine pled guilty in January 2024. Because the government seeks to use both prior convictions, the Court will address the admission of the 2024 convictions, too.

using evidence of two prior convictions: first, Germine's January 2024 guilty plea to a 48-count indictment charging violations of the Export Control Reform Act (50 U.S.C. § 4819), conspiracy to commit smuggling and defraud the United States (18 U.S.C. §§ 371, 554(a)), smuggling and aiding and abetting (18 U.S.C. §§ 554(a), 2), and laundering of monetary instruments and aiding and abetting (18 U.S.C. §§ 1956(a)(1)(A), (a)(2)(A), 2); and second, an earlier Haitian conviction for manslaughter.[11] Gov't Omnibus Opp'n at 4–5. For the following reasons, the Court will deny the motion in part.

### A. The government may impeach Germine with his 2024 convictions.

Federal Rule of Evidence 609 governs the admissibility of a prior conviction for impeachment purposes. Under that rule, admission is mandatory, as is relevant here, if the crime, "in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year" and "the probative value of the evidence outweighs its prejudicial effect to th[e] defendant." Fed. R. Evid. 609(a)(1)(B).[12] Each count of Germine's January 2024 convictions was punishable by imprisonment of more than one year, thereby meeting the first requirement. See 50 U.S.C. § 4819(b)(2); 18 U.S.C. §§ 371, 554, 1956(a); see also Presentence Investigation Report, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 219] at 1–2.[13]

---

The Court cautions Germine from continuing to resubmit motions from his past trial that contain outdated or irrelevant information.

[11] Federal Rule of Evidence 609 covers convictions "rendered in any forum, including . . . foreign," as well as "convictions . . . based on . . . a plea of guilty." United States v. Pettiford, 238 F.R.D. 33, 37 (D.D.C. 2006) (quoting 28 Fed. Practice & Proced. § 6133 (1st ed. 1993), first at 210–11 and then at 212).

[12] To the extent Germine argues that admission requires the government to "demonstrate that the prior convictions have underlying facts involving some element of deceit, untruthfulness, or falsification," see Mot. in Limine ¶ 5, that is an incorrect reading of Rule 609. It is true that under Rule 609 the Court must admit a prior crime that "required proving—or the witness's admitting—a dishonest act or false statement," Rule 609(a)(2), but that is not the only way to admit a prior conviction, see Rule 609(a)(1). Nor does the government argue for admission under Rule 609(a)(2).

[13] That Germine has appealed his January 2024 convictions does not change the test for their admissibility, although Germine may admit "[e]vidence of the pendency" of that appeal. See Fed. R. Evid. 609(e).

Turning to the next step, the D.C. Circuit "has recognized that 'all convictions that meet the Rule 609(a)(1) threshold are at least somewhat probative of credibility.'"  Anderson, 174 F. Supp. 3d at 106 (quoting United States v. Lipscomb, 702 F.2d 1049, 1051 (D.C. Cir. 1983) (en banc)).  But this does not open the floodgates to admitting all prior convictions.  Instead, under Rule 609(a)(1)(B) a court must perform a "'careful and thoughtful' balancing" of a conviction's probative value against its prejudicial effect that "does not 'lead inexorably to admitting the prior conviction into evidence.'"  United States v. Savoy, 889 F. Supp. 2d 78, 118 (D.D.C. 2012) (cleaned up) (quoting Lipscomb, 702 F.2d at 1063); see also, e.g., United States v. Tucker, 12 F.4th 804, 823 (D.C. Cir. 2021).  Courts generally consider several factors in this analysis, including the date and type of conviction (i.e., whether the prior charges were similar to the instant charges), the importance of the defendant's testimony and credibility to the instant trial, and the impeachment value of the prior crime.  See, e.g., United States v. Holland, 41 F. Supp. 3d 82, 93 (D.D.C. 2014) (citing United States v. Jackson, 627 F.2d 1198, 1209 (D.C. Cir. 1980)).

These factors collectively weigh in favor of admitting the 2024 convictions here.  To start, the "precise value" of a prior conviction depends in part on "how stale the felony conviction has become."  See Moore, 75 F. Supp. 3d at 455 (citing Lipscomb, 702 F.2d at 1062).  The 2024 convictions are fresh—approximately one year old.  Next, the theory that prior convictions for the same crimes as the charged conduct "may be prejudicial" and "should be admitted sparingly," Anderson, 174 F. Supp. 3d at 107 (quoting Savoy, 889 F. Supp. 2d at 119), does not apply here. Germine was convicted in 2024 for export control, smuggling, and money laundering offenses— crimes distinct from hostage taking.

Should Germine testify, his credibility would likely be "central to the trial," which further favors admission.  See Moore, 75 F. Supp. 3d at 455.  Germine was in a Haitian prison during the

charged conduct.  As such, his knowledge of and intent to aid and abet the hostage taking are material to the government's case.  And "where there are conflicts in testimony, 'it is of prime importance that the jury be given as much help in determining credibility as the Rules of Evidence permit.'"  Anderson, 174 F. Supp. 3d at 107 (quoting United States v. Lewis, 626 F.2d 940, 950 (D.C. Cir. 1980)).  In other words, because "what [Germine] might say in his own defense . . . could play a significant role in the jury's verdict . . . the probative value of [his] prior conviction[] is quite high."  Moore, 75 F. Supp. 3d at 455; see, e.g., Lewis, 626 F.2d at 950.

Finally, the impeachment value of Germine's 2024 convictions is relatively high.  The D.C. Circuit has "distinguished between crimes that reflect adversely on a person's integrity, and which therefore bear on honesty—such as those involving deceit, fraud, and theft—and acts of violence, which may result from a short temper . . . and generally have little or no direct bearing on honesty and veracity."  Holland, 41 F. Supp. 3d at 93 (cleaned up) (citing Gordon v. United States, 383 F.2d 936, 940 (D.C. Cir. 1967)).  Because the purpose of Rule 609 is to permit attacks on a witness's character for truthfulness, the touchstone for probativeness is whether the conviction falls into the former group and demonstrates the witness's lack of veracity.  See United States v. Crawford, 613 F.2d 1045, 1052 (D.C. Cir. 1979).

Germine was convicted for, inter alia, conspiracy to commit smuggling and defraud the United States in violation of 18 U.S.C. § 371, and the conduct underpinning these convictions was plainly deceitful.  In his statement of offense, Germine admitted that he "entered into an agreement with others to smuggle firearms . . . and to defraud the United States by interfering with . . . the enforcement by ATF of the laws and regulations related to the purchase of firearms by means of deceit."  Statement of Offense, United States v. Germine, Crim. A. No. 21-699 (JDB) [ECF No. 157] at 3.  He also "knowingly and willfully . . . attempt[ed] to export the listed firearms to Haiti

without having first obtained the required licenses." Id. at 4.  Finally, Germine knew that some of the money involved in his firearm purchases was "proceeds . . . of kidnappings of U.S. citizens for ransom." Id. at 5.

Multiple instances of fraudulent and deceitful conduct during an extended conspiracy "reflect more strongly on [Germine's] credibility" and are highly probative.  Anderson, 174 F. Supp. 3d at 107; see, e.g., United States v. Knight, Crim. A. No. 07-81 (CKK), 2007 WL 1760939, at *3 (D.D.C. June 18, 2007) (prior conspiracy conviction "reflects a concerted plan to engage in criminal behavior" and is probative of credibility); Hardy v. Adams, 654 F. Supp. 3d 159, 165–66 (N.D.N.Y. 2023) (taking same approach in analyzing prior conspiracy conviction); see also United States v. Appiah, Crim. A. No. 19-361 (BAH), 2020 WL 3469688, at *11 (D.D.C. June 25, 2020) (convictions relating to "a scheme to transport hundreds of thousands of dollars-worth of marijuana across the country" "show[ed] conscious disregard for the law and thus reflect more strongly on credibility" (cleaned up)).

Finally, the Court acknowledges there are heightened concerns of prejudice where, as here, the witness is the defendant rather than a third party.  See, e.g., Anderson, 174 F. Supp. 3d at 108. Yet this prejudice is lessened where, as here, "the jury is [likely] already going to hear about these other crimes" in the government's case-in-chief.  See Moore, 75 F. Supp. 3d at 456.  In other words, because the Court will grant the government's motion to admit evidence about Germine's export control, gun smuggling, and money laundering activities under Rule 404(b), see supra section III.B, the prejudice from using the corresponding convictions for impeachment purposes is only "incremental" and "has already been considered and dealt with in the Court's Rule 404(b) analysis." Moore, 75 F. Supp. 3d at 456; see, e.g., Thorne, 2020 WL 122985, at *25 ("The potential prejudice that comes from admitting . . . prior convictions is minimal when the jury has

already been exposed to those prior convictions for some other purpose." (cleaned up)).

But the Court will not admit the 2024 convictions wholesale. Although Germine did not raise this point, the Court concludes that the number of charges to which Germine pled guilty—48—is prejudicial and not itself highly probative of credibility. See Del Pesce v. Ingraham, Civ. A. No. 16-818 (DEP), 2019 WL 2462275, at *4 (N.D.N.Y. June 13, 2019) (noting the "jury was not permitted to hear the specific number of counts" under Rule 609 because "such information had limited bearing on plaintiff's truthfulness"). The Court draws the following line to balance the convictions' high probative value with the reduced but still present concern of prejudice: the government may impeach Germine with the four distinct offenses for which he was convicted in 2024 and the total length of the sentence imposed—420 months imprisonment—but may not reveal the number of counts to which Germine pled guilty. See, e.g., Tucker, 12 F.4th at 823 (recognizing district courts have discretion to tailor and limit cross-examination of prior convictions); United States v. Pettiford, 238 F.R.D. 33, 42 (D.D.C. 2006) (limiting impeachment to "the fact that [defendant] is a convicted felon who was previously sentenced in 1991 to a term of seven to twenty-one years imprisonment"); United States v. Kelly, Crim. A. No. 21-59 (RC), 2023 WL 3203089, at *10 (D.D.C. May 2, 2023) (similar).

### B. The Court reserves judgment as to whether the government may impeach Germine with his prior Haitian conviction.

The Court defers ruling on Germine's motion in limine as to his Haitian manslaughter conviction. See, e.g., Barnes v. District of Columbia, 924 F. Supp. 2d 74, 79 (D.D.C. 2013) ("The trial judge's discretion extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion in limine presents an evidentiary issue that is appropriate for ruling in advance of trial."); see also Luce v. United States, 469 U.S. 38, 41–42 (1984) ("[T]he district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine

ruling."). The government has failed to provide the information necessary to the Court's analysis.

To start, neither party seems confident that the Haitian conviction was indeed for manslaughter. Germine admits that he may have a prior Haitian conviction but seems to dispute that the government has proof that it was for manslaughter. See Mot. in Limine ¶ 2 (Germine "believes" he has a prior Haitian conviction, but "the U.S. Probation Office [has been] unable to ascertain any reliable information"); Gov't Omnibus Opp'n at 4 (the government has already provided all "information about [his Haitian conviction] which is in the government's possession"). The government does not seem confident, either. See Gov't Omnibus Opp'n at 4 ("the government believes that Defendant was previously convicted in Haiti for manslaughter").

Additionally, although "a felony's probative value diminishes with time," Appiah, 2020 WL 3469688, at *7, the government has not provided the date of conviction, simply claiming it occurred "less than ten years ago," Gov't Omnibus Opp'n at 4. Whether the conviction was four years or nine years and 11 months ago may matter. See, e.g., Lipscomb, 702 F.2d at 1062 ("many 9-year-old convictions are only slightly probative").

Because the Court is missing information that is material to a Rule 609 analysis, and because it is unclear whether Germine will testify at trial, the Court will defer ruling on Germine's prior Haitian conviction unless and until the issue arises at trial.[14]

\*          \*          \*

## Conclusion

For the foregoing reasons, the Court will deny Germine's motion to dismiss, motion to suppress, and motion in limine as it pertains to his 2024 convictions, and the Court will grant the

---

[14] Germine also seeks to prevent the government from using the prior convictions in its opening statement. See Mot. Limine at 1. Because Rule 609 only deals with the use of prior convictions for impeachment, this part of Germine's motion is best reviewed under Rules 404(b) and 403. To the extent the Court has admitted evidence under Rules 404(b) and 403, then the government may use the evidence in its opening statement.

government's motion for 404(b) evidence.  A separate Order will issue on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: <u>April 21, 2025</u>